FILED
2015 Dec-02  PM 04:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **GEMSTONE FOODS, LLC and RCF, LLC** | } } } } } | |
| **Plaintiffs;** | } } } | |
| **vs.** | } } } | |
| **AAA FOODS ENTERPRISES, INC.; A&M CONSULTING FIRM, LLC; PORTIONING PARTNERS; FARM FRESH FOODS, LLC; COOPER, HILL & LECROIX, CPAs; MICHAEL CLAUDE ENSLEY; ANNETTE CARR; SHANE PASS; MARK WELBORNE; MATTHEW WESTER; EDWARD L. HILL; GARY HILL; DEBORAH CAMPOS; and John and Jane Does 1-10** | } } } } } } } } } } } } } } } } } } } | **Case No.:** _____ |
| **Defendants.** | } } | |

## COMPLAINT
## (JURY TRIAL DEMANDED)

COME NOW, Plaintiffs Gemstone Foods, LLC and RCF, LLC ("Plaintiffs"),

and for their Complaint against AAA Foods Enterprises, Inc.; A&M Consulting

Firm, LLC; Portioning Partners; Farm Fresh Foods, LLC; Cooper, Hill & LeCroix,

CPAs; Michael Claude Ensley; Annette Carr; Shane Pass; Mark Welborne; Matthew

Wester; Edward L. Hill; Gary Hill; Deborah Campos; and John and Jane Does 1-10 show unto the Court as follows:

## I.

## NATURE OF THE CASE

1.1     This is an action under the Racketeer Influenced and Corrupt Organizations Act ("RICO") brought by Plaintiffs for violations of 18 U.S.C. §§ 1962(c) and (d), as well as for fraud, misrepresentation, negligence and wantonness, civil conspiracy, breach of contract, warranty and other related causes of action.  It targets a criminal enterprise, as defined by RICO, primarily controlled by two or more persons who, through at least two entities and various employees, (1) fraudulently represented the pricing of goods to enrich themselves and the companies they controlled and (2) systematically stripped assets from the Plaintiffs, all through a conspiracy with several others that resulted in the creation of a competing business, through unlawful means, including mail and wire fraud, in complete disregard of Plaintiffs' rights.

1.2     By virtue of this criminal enterprise, Defendants fraudulently misrepresented pricing of millions of pounds of poultry products and thereby induced Plaintiffs to unknowingly purchase the products at inflated prices. Plaintiffs, relying on certain Defendants' representations and certifications regarding the pricing of the poultry products, accepted and paid the fraudulent prices invoiced

to them and unknowingly allowed Defendant Michael Claude Ensley, along with the other Defendants, to continue operating to the detriment of Plaintiffs.

## II.

## PARTIES

2.1     Plaintiff Gemstone Foods, LLC ("Gemstone") is a Mississippi limited liability company that conducts business in Morgan County, Alabama.

2.2     Plaintiff RCF, LLC ("RCF") is an Alabama limited liability company that conducts business in Morgan County, Alabama.

2.3     Defendant AAA Foods Enterprises, Inc. ("AAA"), upon information and belief, is an Arkansas corporation that has conducted business in Morgan County, Alabama, and may be served with process and this Complaint at 1111 Fayetteville Road, Van Buren, Arkansas 72956.

2.4     Defendant A&M Consulting Firm, LLC ("A&M") is a limited liability company that has conducted business in Morgan County, Alabama, and may be served with process and this Complaint by service on Clint G. Bearden, Registered Agent, at 190 McKinney Street, Blue Ridge, Georgia 30513.

2.5     Defendant Portioning Partners ("Portioning Partners"), upon information and belief, is an Arkansas company that has conducted business in Morgan County, Alabama, and may be served with process and this Complaint at Post Office Box 2462, Alma, Arkansas 72921.

2.6    Defendant Farm Fresh Foods, LLC ("Farm Fresh Foods"), upon information and belief, is an Alabama limited liability company that conducts business in Marshall County, Alabama, and may be served with process and this Complaint by service on Eddie Hill, Registered Agent, at 708 2nd Avenue SE, Decatur, Alabama 35601.

2.7    Defendant Cooper, Hill & LeCroix, CPAs ("LeCroix") is a company conducting business in Morgan County, Alabama, and may be served with process and this Complaint by service on Eddie Hill, CEO and Registered Agent, at 708 2nd Avenue SE, Decatur, Alabama 35601.

2.8    Defendant Michael Claude Ensley ("Ensley") is an adult resident citizen of Georgia who may be served with process of this Complaint at Post Office Box 191, Epworth, Georgia 30541, or wherever he may be found.

2.9    Defendant Annette Carr ("Carr"), upon information and belief, is an adult resident citizen of Missouri who may be served with process of this Complaint at 1111 Fayetteville Road, Van Buren, Arkansas 72956, or wherever she may be found.

2.10   Defendant Shane Pass ("Pass") is an adult resident citizen of Alabama who may be served with process of this Complaint wherever he may be found.

2.11    Defendant Mark Welborne ("Welborne") is an adult resident citizen of Alabama who may be served with process and this Complaint wherever he may be found.

2.12    Defendant Matthew Wester ("Wester") is an adult resident citizen of Alabama who may be served with process and this wherever he may be found.

2.13    Defendant Edward L. Hill ("Eddie Hill" or "Eddie Hill, CPA") is an adult resident citizen of Alabama who may be served with process and this Complaint wherever he may be found.

2.14    Defendant Gary Hill ("Gary Hill") is an adult resident citizen of Alabama who may be served with process and this complaint wherever he may be found.

2.15    Defendant Deborah Campos ("Campos") is an adult resident citizen of Alabama who may be served with process and this complaint wherever she may be found.

2.16    John and Jane Does 1- 10 are individuals involved in all or any part of the actions pled in this Complaint.  These persons were represented by Ensley as qualified and loyal management level operators whom Ensley trusted and who could be trusted by Turnage.  They (1) had knowledge of, or concealed, an invoicing scheme whereby Carr/AAA and Ensley/A&M defrauded Gemstone of money through a fraudulent invoicing scheme, (2) were involved in the preparation for and

business of Farm Fresh Foods prior to leaving the employment of Gemstone or RCF, and/or (3) assisted other Defendants in the misappropriation of Gemstone and RCF's business opportunities.

## III.

## JURISDICTION AND VENUE

3.1     This Court has original jurisdiction over the civil RICO claim stated herein pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(a).  The Court may exercise supplemental jurisdiction over the state law claims stated herein pursuant to 28 U.S.C. § 1367, as all of the claims are inextricably intertwined.

3.2     Venue is proper in the Northern District of Alabama pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.  Venue is also proper under 18 U.S.C. §§ 1965(a) and (b) because some or all of the Defendants reside in this judicial district.

3.3     This Court has personal jurisdiction over each Defendant because each Defendant possesses a place of business in this judicial district, has transacted business in this judicial district, has an agent in or to transact its affairs in this judicial district, or otherwise has availed itself/himself/herself to the jurisdiction of this court through its/his/her conduct as described herein.

## IV.

## FACTS

### <u>Overview and Parties</u>

4.1    In late 2012 and early 2013, Ben O. Turnage ("Turnage") initiated communications with Ensley concerning Turnage's interest in the purchase of a financially troubled company named Diamond Foods ("Diamond").  Diamond was a company located in Alabama that cut and sized poultry products for its customers. Ensley communicated extensively with Turnage concerning Turnage's potential acquisition of Diamond.  Ultimately, after considerable efforts over the course of several months to develop an agreeable acquisition plan, the owners of Diamond rejected Turnage's efforts.

4.2    Although his efforts to acquire Diamond were unsuccessful, Turnage realized that operation of a poultry processing venture could be a profitable business and would create benefits, including many jobs, for the local community.  As a result, Turnage began exploring a new start-up poultry processing business in Alabama.

4.3    Ensley was aware of Turnage's interest in the poultry processing business and made overtures to him about starting a new business.  Ensley was interested in working with Turnage in the set-up, development, and operation of a poultry business in northeast Alabama.  Ensley made representations, promises,

and/or agreements with/to Turnage concerning opportunities in the poultry processing business. Ensley also knew that while he did not have the ability to finance a start-up operation and had little experience in plant acquisition or business organization, he had been employed in the poultry processing business and possessed experience in the industry. Ensley represented to Turnage that he possessed contacts in the poultry processing business and that he could bring in qualified individuals to help manage the business.

4.4     Ensley developed a relationship with Turnage and Plaintiffs in which Ensley convinced them he was a person in whom Turnage and Plaintiffs should place special trust and reliance as an individual with knowledge of the poultry processing business who would look out for their best interests. Ensley instilled trust in Turnage and Plaintiffs that Ensley should be relied upon to run the day-to-day operations of a new company in the poultry processing business.

4.5     Further, Ensley introduced Turnage to Annette Carr. Carr was involved in the purchase and sale of poultry in the marketplace. Carr conducted business through AAA. She always operated AAA as an alter ego of herself. AAA had no recognizable identity separate from Carr. Carr used AAA to accomplish the purposes set forth in this Complaint against Plaintiffs' interests. Carr had a strong relationship with Ensley. Ensley represented Carr to be a trusted partner who could source product at the lowest possible cost and bring sales via her network.

4.6    Ensley also introduced Turnage to an individual named Mark Welborne, who was represented to be a poultry plant manager who could operate a poultry processing operation.

4.7    Ensley further introduced Turnage to an individual named Shane Pass, who was represented to be a capable Technical Services Director and plant administrator with experience in the poultry processing business.

4.8    Ensley also introduced Turnage to an individual named Deborah Campos, who was represented to be an experienced and capable plant manager for a poultry processing operation.

4.9    In addition, Ensley introduced Turnage to an individual named Matthew Wester, who was represented to be a Quality Assurance Manager and Shipping Manager qualified to handle quality and shipping issues in the poultry processing business.

4.10    Each of these individuals referenced above in Paragraphs 4.5-4.9 were represented to be qualified and loyal management level operators whom Ensley trusted and who could be trusted by Turnage. Ensley assured and continued to instill in Turnage that he had the ability to bring in the best people at high level management positions to operate a poultry processing plant and that he could be trusted with running the operations of a new poultry processing business in which Turnage would invest significant money, capital and resources.

9

4.11   Based on the information gathered by Turnage, along with his growing trust and confidence in Ensley, Turnage elected to move forward and began searching for a building in which to house the new business.

4.12   While Turnage was interested in the idea of a poultry processing operation, he also brought a wealth of knowledge and experience in financial management and creativity regarding additional ways to enhance profitability of businesses.  Turnage determined that unlike Diamond, which focused primarily on cutting chicken products to size, his new business endeavor—which he named Gemstone Foods—would also focus on the acquisition and sale of poultry products on the wholesale market.

4.13   Ultimately, a shuttered poultry processing plant on Holly Street in Decatur, Alabama, was identified.  The plant had been operated under the name River City Foods ("RCF") for many years, and it was ready for operations.  The decision was made to purchase RCF, including but not limited to its physical plant and equipment.  RCF and Gemstone have common ownership and are related entities.  RCF currently employs between 600 and 700 employees in Decatur, Alabama.

## General Business Operations

4.14   After acquisition, RCF reopened as the operator of a processing plant for poultry products.   In order to facilitate the acquisition and sale of poultry products, Gemstone was created.

4.15   Business operations for Plaintiffs RCF and Gemstone began in March, 2013.   Ensley began as the President of both entities.   RCF handled the poultry processing operations and provided the plant, labor and other services to Gemstone, while Gemstone handled the acquisition and sale of the poultry products that RCF processed.   Ensley hired Welborne, Pass, Campos, Wester, and Gary Hill as upper level managers for RCF and Gemstone.   In order to gain their trust and loyalty, Ensley directed that RCF pay these individuals significantly higher salaries in comparison to their prior salaries in similar capacities.

4.16   An initial business model was created by Turnage for RCF and Gemstone to acquire, size, and sell poultry to customers.   As part of the business plan, at the direction of Ensley, Carr and AAA were to acquire and supply Gemstone with poultry products.   The payment term for Carr and AAA, as well as customers, was seven days.

4.17   Ensley managed RCF's poultry operations at the Holly Street plant, as well as day-to-day operations of Gemstone.   Pass was the Technical Services Director, Welborne and Campos were Plant Managers, and Wester was the Quality

Assurance ("QA") Manager. Soon after operations began, the seven-day payment term began to cause problems because customers were not paying their invoices within seven days. Nevertheless, Gemstone was required to pay Carr and AAA within seven days.

4.18 Previously, Ensley had assured Turnage that Ensley had a relationship with a bank that would provide a line of credit in the amount of $4,000,000 without the requirement of personal guarantees. Ensley had continually made this representation to Turnage throughout the process of organizing the new business. Ultimately, contrary to Ensley's representations, a personal guarantee was required for the line of credit. Unwilling to agree to this requirement, Turnage independently secured a line of credit in the amount of $2,500,000 without the requirement of a personal guarantee in order to support the business.

4.19 Pursuant to the line of credit secured by Turnage, a validity guarantee was required. The validity guarantee required Turnage, Ensley, and an individual named Robin Hunt ("Hunt"), who was the chief financial officer at the time, to sign a guarantee that all invoices submitted to the lender were valid and accurate.

4.20 Ensley, Turnage, and Hunt agreed to sign, and did sign, the validity guarantee. As a result, the cash advances necessary to maintain cash flow for the business were attained and funded.

4.21   Shortly thereafter, while serving as President of RCF and Gemstone, Ensley independently hired legal counsel and, without Turnage's knowledge or approval, instructed counsel to rescind the validity guarantee, which he did. When Turnage became aware of this, he was shocked because he knew that the line of credit was critical in order to maintain cash flow for operations. Turnage immediately took action to have the rescission reversed so that the line of credit could be maintained.

## Services Provided by Carr and AAA to Gemstone

4.22   Regarding the services provided by Carr and AAA ("Carr/AAA"), Carr/AAA entered into an agreement with Gemstone to purchase poultry products on the market at the best price possible and to sell the poultry products to Gemstone. Pursuant to the agreement, under which Carr/AAA supplied poultry products to Gemstone, Carr/AAA was to be paid cost plus, with Gemstone paying Carr/AAA $0.01 per pound above actual cost paid for large volume sales and $0.02 per pound above actual cost paid for one-off, small volume loads that were not in the ordinary course of business. This agreement on pricing between Carr/AAA and Gemstone was confirmed in writing as well as in multiple telephone conversations among Ensley, Carr, and Turnage.

4.23   As a result of the special relationship of trust and confidence that Ensley instilled in Turnage and Plaintiffs RCF and Gemstone, Ensley was permitted to make

daily business decisions on the part of RCF and Gemstone that were consistent with company policy and procedures. Ensley directed that invoices from Carr/AAA be paid by Gemstone via bank wire transfer on an immediate basis without any review, analysis, or supporting documentation.

4.24   Both Ensley and Carr continually assured Turnage and Gemstone that the cost plus agreement under which Carr/AAA supplied poultry products was an outstanding and fair contract for Gemstone. According to Ensley and Carr, Gemstone was fortunate to have its relationship with Carr because of her strong relationships within the industry which allowed her to attain the best pricing possible for Gemstone.

4.25   In addition to the agreement for poultry supply between Carr/AAA and Gemstone, Carr represented to Turnage and Plaintiffs Gemstone and RCF that she was interested in selling her business to Gemstone and going to work as an employee of the company. Carr stated that she wanted to accomplish this as soon as possible, and Ensley confirmed the same to Turnage. These communications occurred throughout 2013 and 2014, but nothing ever materialized.

4.26   By January of 2014, business operations at the Holly Street plant were maximized, so Turnage and RCF began to consider opening a new plant in Decatur, Alabama. An adequate facility was found, which was located at 805 McEntire Lane, and a lease for the McEntire plant was executed. By April 2014, the McEntire plant

14

was ready for operations.  With Ensley in complete control of operations for both plants, together with his trusted management team, business continued to grow. Also, Carr continued to represent to Gemstone that her fee for supply of poultry products to Gemstone was pursuant to the cost plus agreement between Carr/AAA and Gemstone as previously described.

### Ensley's Unreasonable Demand for 50% Ownership of RCF and Gemstone

4.27  Prior to January, 2014, Turnage and Plaintiffs RCF and Gemstone maintained an agreement with Ensley regarding Ensley's compensation package under which Ensley did not possess or expect any ownership interest in the business. Nevertheless, in January, 2014, Ensley sought additional salary and bonus compensation.  Unbeknownst to Turnage, Ensley had represented himself in the marketplace as an owner of RCF and Gemstone.  In keeping with these representations, Ensley subsequently demanded a 50% ownership interest in RCF and Gemstone.

4.28  Plaintiffs RCF and Gemstone refused to oblige Ensley's demand for ownership in the business; however, an understanding was reached under which Ensley would continue as President of RCF and Gemstone and additionally would be paid a substantially higher compensation package, including increases to both his salary and bonus, with the bonus being paid to A&M at Ensley's request.  Ensley represented A&M as a company owned by him.  He always operated A&M as an

alter ego of himself, including having his bonus paid to A&M. Between January, 2014, and July 31, 2014, Ensley approached Turnage and Plaintiffs RCF and Gemstone on three separate occasions. Each time, Ensley would renounce his prior demands (each of which had resulted in substantially increased compensation) and demand another increase in his compensation package. Ensley also demanded contribution to a proposed retirement plan for his benefit. Increases in Ensley's pay and bonus were granted on each occasion; however, these increases were based upon the expectation by Turnage and Plaintiffs of a long term relationship and employment agreement with Ensley, which never materialized. Accordingly, no agreement was ever reached as to contributions to the proposed retirement plan. In 2014, Ensley and his company, A&M, were paid compensation in excess of $1,500,000 by RCF and Gemstone.

4.29   In the fall of 2014, Ensley began discussing with Turnage his earnest intent to retire. Ensley sought a retirement package from RCF and Gemstone, so Turnage began negotiating an attractive retirement package. Ensley delayed the process, however, which confused Turnage and Plaintiffs RCF and Gemstone. The agreement proposed by RCF and Gemstone included traditional representations and warranties concerning the quality and good faith of his actions as President of RCF and Gemstone, as well as typical post-employment restrictive covenants. While RCF and Gemstone extended a written offer that required only Ensley's signature,

Ensley returned the offer with the representation, warranties, and restrictive covenants sections stricken and refused.

4.30   In late 2014, RCF and Gemstone began to experience numerous management issues. For example, at Ensley's direction, high-level employees who earned six-figure salaries began to receive "Saturday pay" if they showed up on Saturdays, regardless of whether they actually worked. Ensley also began to unilaterally purchase company vehicles for numerous employees, also without approval. In addition, Welborne and Gary Hill unilaterally changed the employee pay scale during Ensley's tenure, an act which resulted in additional labor expenses to Gemstone of approximately $18,000 per week. These problems continue to cost Gemstone unnecessary expense.

## The Urner Barry System of Market Pricing for Poultry Commodities

4.31   Pricing for chicken commodities is set daily by various reporting services. The most common is a system called the Urner Barry ("UB") guideline.[1] The UB system is a benchmark on which chicken commodities are bought and sold on the wholesale market.

4.32   Turnage often would inquire of Ensley as to how the market was fairing and the status of their wholesale purchases of poultry products. Ensley frequently responded that the market was extremely tight. He would inform Turnage that

---

[1] *See* http://www.urnerbarry.com/whoweare.aspx.

Gemstone had been lucky because Carr/AAA was able to secure some wholesale poultry for purchase, even in the tough market conditions.

4.33   Turnage, on his own investigation, discovered that the poultry market was extremely loose, with prices on the decline during these times.  For example, under the UB market pricing, Turnage would receive information that he could obtain multiple loads at 25-30 cents per pound below the UB, which was contrary to what Ensley had informed Turnage about pricing, with Ensley stating that the market was approximately 6 cents per pound below the UB.  Until late 2014, Turnage had trusted Ensley implicitly as well as the integrity of Carr/AAA based upon Ensley and Carr/AAA's assurances concerning poultry acquisition and sale.

4.34   Subsequently, however, Turnage realized that with Gemstone running approximately 40 loads per week (8 loads a day), the company could be losing as much as $30,000 per day if AAA was not living up to its agreement to provide product at the best market pricing available.

4.35   Turnage learned that Carr/AAA had negotiated a sliding scale agreement with a particular supplier that set a ceiling and floor for pricing throughout the year in order to reduce exposure to market ebbs and flows and thereby lower Gemstone's risk.

4.36   With this knowledge, Turnage and Gemstone inquired of Ensley and Carr/AAA regarding the pricing model that Carr/AAA utilized for acquisition of

poultry products from the supplier with whom they maintained the sliding scale agreement.

4.37   Ensley and Carr informed Turnage that the pricing model utilized by Carr/AAA was set on a sliding scale of 5 to 12 back of the UB market price. In other words, under the sliding scale agreement, regardless of the UB market price, Carr/AAA would never pay less than $0.12 per pound below the UB market price or more than $0.05 per pound below the UB market price for poultry products.

## Fraudulent Breach by Ensley, Carr, and AAA

4.38   In late 2014, Turnage learned that Carr/AAA's agreement with the sliding scale supplier was 12 to 19 cents back per pound. This means that in 2014, Carr/AAA never paid less than $0.19 per pound below the UB market price (as opposed to the $0.12 reported by Ensley and Carr) and never paid more than $0.12 per pound below the UB market price (as opposed to the $0.05 reported by Ensley and Carr) when acquiring poultry products for Gemstone from this supplier.

4.39   Turnage realized that Carr and AAA had fraudulently submitted invoices electronically to Gemstone that substantially exceeded the cost plus agreement between Carr/AAA and Gemstone. Ensley, as President of RCF and Gemstone, ensured that Gemstone paid Carr/AAA's fraudulent invoicing upon receipt via bank wire transfer. On information and belief, Ensley was aware of the erroneous invoices submitted by Carr/AAA and had intentionally misrepresented the

pricing to Turnage and Gemstone, who had no knowledge of this fraudulent invoicing scheme.

4.40   Turnage and Plaintiffs RCF and Gemstone did not discover Carr/AAA's fraudulent invoicing scheme until after Ensley's departure from RCF and Gemstone. Moreover, it was not until later that the magnitude and extent of the fraud became apparent. In retrospect, Turnage and Plaintiff's RCF and Gemstone realized that after Ensley announced his intent to retire in August, 2014, Ensley mysteriously delayed his retirement on a continual and methodical basis until late November, 2014 in order to further the fraudulent scheme.

4.41   Over the course of time, Turnage and Plaintiffs RCF and Gemstone discovered that Ensley and Carr were romantically involved and had been for some time. Turnage and Plaintiffs RCF and Gemstone discovered that Ensley had allowed Carr to live in the Plaintiffs' apartment leased in Decatur, Alabama, and that Ensley had even utilized Plaintiffs' resources to move Carr's personal belongings from Arkansas. Upon information and belief, Ensley and Carr cohabitated in the company apartment for a substantial period of time. This occurred during the time period when Ensley served as company President of RCF and Gemstone and while Carr/AAA provided services to Gemstone.

4.42   In addition to the false and fraudulent invoices that Carr/AAA submitted to Gemstone for payment, Turnage and Plaintiffs RCF and Gemstone also

discovered shipping documentation identifying loads of poultry products that were delivered to a poultry processing plant in Dallas, Texas called Dallas U.S.A., rather than to Gemstone. Because Gemstone did not own a poultry processing plant or other any operations in Dallas, Texas, Turnage asked Ensley about the documents. Among other issues, Turnage inquired as to whether these poultry products had been provided to a competitor of Gemstone's and whether Gemstone had provided poultry products to a Dallas U.S.A. operation for which Gemstone had not been properly paid or otherwise compensated. Ensley, as President of RCF and Gemstone, assured Turnage that these transactions were properly accounted for. Upon information and belief, however, Ensley and Carr were using Gemstone resources to usurp corporate opportunities belonging to RCF and Gemstone by providing sales and loads of poultry products to other poultry businesses including Dallas U.S.A.

4.43   In or about November, 2014, Turnage and Ensley agreed that Ensley's employment relationship with Plaintiffs RCF and Gemstone would end on November 30, 2014. Just before Ensley's separation from RCF and Gemstone, Carr/AAA submitted a $1,131,874 statement to Gemstone that was received on November 21, 2014, which included numerous invoices for services that were much older than the seven-day term contractually agreed upon by Carr/AAA and Gemstone. Because Ensley had set up Gemstone's accounting processes whereby Gemstone would pay Carr/AAA's invoices by bank wire automatically upon receipt,

Gemstone paid the delinquent statement for $1,131,874 without question, review or documentation.

4.44   The invoices included in the November 21 statement from Carr/AAA were between four and nine weeks old.  In all of her dealings with Gemstone in the past, Carr always submitted her invoices immediately after the deliveries were made to Gemstone and would demand that the invoices be paid within seven days.  In this instance, the delinquent invoices mysteriously appeared (and were paid) on the eve of Ensley's departure.

4.45   In January, 2015, Carr/AAA inquired about monies she believed she was owed for loads she had purchased for Gemstone directly, and not thru AAA, for which she was to be paid $0.005 per pound.  In response, Turnage requested that Carr/AAA provide invoicing and cost documentation for all sales by her/AAA to Gemstone.  Carr/AAA ignored Turnage's request and have continuously refused to provide any information about their services to Gemstone since that time.

### Fraudulent Breach by Eddie Hill and LeCroix

4.46   Stepping back in time, in June, 2013, Hunt was no longer employed by RCF/Gemstone, thereby leaving RCF and Gemstone without a Chief Financial Officer ("CFO").  Therefore, Turnage and Plaintiffs RCF and Gemstone contacted Cooper, Hill & LeCroix, a CPA firm, to obtain in-house accounting, CPA and CFO services on an interim basis.  At this time, Eddie Hill was a Certified Public

Accountant and named partner at LeCroix. Turnage had extensive discussions with Eddie Hill regarding the services that RCF and Gemstone needed, and Eddie Hill confirmed that he and his firm were well capable of providing said services and were one of the most respected CPA firms in Decatur.

4.47 From June, 2013, through April of 2014, Eddie Hill—through LeCroix—served as interim CFO for RCF and Gemstone. In these roles, Eddie Hill was responsible for the preparation of weekly and monthly financial statements, interim compilation reports, accounting system controls, the general ledger, payroll, accounts receivable, accounts payable, tax compliance, computer support, and other related services. Turnage and Plaintiffs RCF and Gemstone trusted Eddie Hill to provide these services in a competent and ethical manner. They justifiably relied on Eddie Hill to act in the best interests of RCF and Gemstone and in accordance with the professional duties a CPA owes its clients.

4.48 Eddie Hill, through LeCroix, provided these services to RCF and Gemstone during a portion of the same period of time that Carr/AAA were submitting inflated, false, and fraudulent invoices. Eddie Hill was aware that these invoices were being paid on an automatic basis without any review, analysis, or supporting documentation, which resulted in Gemstone's payment of significantly inflated costs for its poultry supply.

4.49    While engaged by RCF and Gemstone in the role of CPA and interim CFO, Eddie Hill worked closely with members of management, including Ensley, Gary Hill, Shane Pass, Mark Welborne and others.    Plaintiffs placed a special confidence in Eddie Hill, and he was entrusted with vital confidential and proprietary information concerning the business model, practices, and business of RCF and Gemstone, including but not limited to competitive market pricing, customer sources, business practices, personnel, and other important information not readily available to the public.

## Discovery of Additional Details of Fraud and Sabotage in 2015

4.50    As discussed below in greater detail below, during 2014 and 2015, a competitor in the poultry processing market by the name of Farm Fresh Foods was established in Guntersville, Alabama to compete directly with Gemstone and RCF. The company is operated, in whole or in part, by Defendants Ensley, Eddie Hill, Pass, Welborne, Wester, Gary Hill, and Campos.  It competes directly with RCF and Gemstone.  While employed by RCF and Gemstone, Ensley made plans to recruit, and did recruit, many RCF and Gemstone high level management personnel and other employees to come to work for Farm Fresh Foods.  Turnage learned that Ensley had intentionally deceived many of the management level personnel who left RCF and Gemstone to go to work for Ensley.  Ensley falsely informed them that they had been in line to receive a piece of ownership in the Gemstone business.  He then

24

exacerbated this fraud by slandering Turnage as the culprit who stopped it. This was all done in an effort by Ensley to sabotage Plaintiffs' business and to build his own.

4.51 Based on Defendants' conduct as described herein, including but not limited to Ensley's knowing misrepresentations to RCF and Gemstone employees, Farm Fresh Foods, as well as majority owner Eddie Hill and other Defendants, began hiring away management employees, QA employees, shipping employees, coordinators, a Plant Manager, shift managers, and many of Gemstone's skilled plant workers.

4.52 Most of the employees that RCF and Gemstone lost to Farm Fresh Foods left RCF and/or Gemstone in February of 2015. The remainder of the key employees lost to Farm Fresh Foods left in March and August. In August, RCF and Gemstone lost its long-time Human Resources Manager, as well as its Shipping Manager, to Farm Fresh Foods.

4.53 Each and every one of the ex-employees/Defendants that RCF and Gemstone lost to Farm Fresh Foods wiped their computers clean and otherwise deleted important company data prior to leaving, severely disrupting the Plaintiffs' business and intentionally concealing the conspiracy among all of the Defendants.

4.54 After Ensley left his employment with RCF and Gemstone, problems were discovered with a large, fixed-price contract that Ensley, along with Gary Hill, had negotiated with one of Gemstone's largest customers. Under the terms of the

fixed-price contract, Gemstone agreed to purchase a large quantity of whole chicken breasts per week for a period of 50 weeks. RCF was responsible for processing, which included cutting the product to a contracted size that fit the customer's requirements.

4.55   Of the total quantity of poultry product supplied, the contractual terms required that a certain portion be processed into "tops" (the top portion of the chicken breast, which is most visually appealing to consumers). The remainder of a load, which could not be processed into tops, would be processed in different ways (as nuggets, for example) and sold for lesser amounts per pound. Therefore, the goal was to process as many tops per load as possible.

4.56   The profitability of the fixed-price contract, from the perspective of RCF and Gemstone, was based on RCF and Gemstone's ability to process tops at a certain "yield." In order to meet the required quota for tops under the terms of the contract, Gemstone was required to process tops at a 40% yield. If Gemstone failed to process tops at a 40% yield, it would be unable to meet the bid estimate, and the contract would become unprofitable. With all such contracts negotiated by Gemstone, RCF and Gemstone would perform "yield analysis" testing to ensure that it was possible to meet the required yield percentage in order to make the contract profitable.

4.57    After Ensley departed from RCF and Gemstone, it became apparent that a problem existed with the fixed-price contract and that Gemstone was losing money on the contract each week.  Therefore, an investigation was conducted to determine the cause of the problem.

4.58    A conference was conducted with Deborah Compos, one of the Plant Managers, regarding the details of the contract.  Campos stated that Ensley and Gary Hill had instructed her to perform yield analysis testing for the fixed-price contract in October, 2014, which was before Gemstone entered the contract.    Campos informed Ensley and Gary Hill that the results of her yield analysis testing indicated that it would be impossible for RCF to yield more than 26-29% when processing the tops for the fixed-price contract.  The yield rate from Campos's testing, therefore, differed significantly from the 40% yield rate that Ensley and Gary Hill used in submitting Gemstone's bid for the contract.

4.59    Plaintiffs RCF and Gemstone searched their records to find Campos's yield analysis, as Turnage and Plaintiffs could not fathom that Ensley would have intentionally entered a contract that would cause Gemstone to lose a significant amount of money.  Turnage and Plaintiffs were able to locate an email from Campos to Ensley, with a copy to Pass and Gary Hill that included the results of her yield analysis testing.

4.60 Just as Campos had stated, her yield analysis testing made clear that it was impossible for Gemstone to process tops at a 40% yield. Because Campos had emailed this analysis to Ensley and Gary Hill prior to the point in time when Gemstone had entered into the contract, it is clear that Ensley and Gary Hill caused Gemstone to enter the large, fixed-price contract with full knowledge of the damning yield analysis. Therefore, Ensley went forward with the contract with knowledge that performance of the contract would cost Gemstone a significant amount of money. Ensley had entered the fixed-price contract just prior to his separation from RCF and Gemstone with the obvious intent to damage RCF and Gemstone.

4.61 Because Ensley, Gary Hill, Pass and possibly others sabotaged RCF and Gemstone with regard to the large, fixed-price contract, Gemstone experienced losses of approximately $48,000 per week over the life of the 50-week contract, resulting in damages totaling approximately $2,400,000. In hindsight, it is clear that Ensley locked RCF and Gemstone into this damaging contract because he knew that he soon would be competing with them. These acts constitute breach of Ensley's duties to RCF and Gemstone in his role as President of these companies.

4.62 As further proof of Ensley's knowledge that he would soon be competing with RCF and Gemstone, Turnage and Plaintiffs RCF and Gemstone have become aware of email exchanges among Pass and Wester (which were written while they were still employed by RCF and/or Gemstone) with Ensley in November

of 2014 in which Ensley requested an organizational chart for RCF and Gemstone. The only reasonable explanation Ensley could have for requesting this information was to support a deal of some kind which was unknown to Turnage. Upon information and belief, Ensley used this information as a model for Farm Fresh Foods.

4.63   Further proof exists in the form of an email dated November 19, 2014, from Ensley to Gary Hill in which Ensley made specific reference to Gemstone's historic total volume and yield volume for portions and tops. That email also was copied to certain other Defendants. This email demonstrates that Farm Fresh Foods was preparing to go after the business held by Gemstone. In April of 2015, Ensley followed up on his plan and the conspiracy by emailing the group about taking the business relationship held by RCF and Gemstone with two of their major customers.

4.64   In 2014, Ensley also made additional major purchases on behalf of RCF and Gemstone in violation of company protocol when he bought one or more of the most expensive Ford trucks available. Turnage learned of the extent of Ensley's purchases only on the eve of Ensley's separation from the company.

4.65   As another example of Ensley's fraudulent conduct, Ensley kept Ron Montgomery, an employee of Carr's, on Gemstone's insurance policy. Ensley likewise took this action without Turnage's knowledge or approval.

4.66   As yet another example of Ensley's fraudulent conduct and side deals which damaged the Plaintiffs, Turnage, RCF and Gemstone have located internal emails to Ensley that indicate Gemstone had provided a specific customer with tenders.  The problem is that Gemstone has no records of having done any business with that customer.   This is further evidence of Ensley's misappropriation of business opportunities belonging to Gemstone and RCF.

4.67   In January, 2015, Carr emailed Turnage and Gemstone about money allegedly owed for poultry products that Carr/AAA had acquired and provided to Gemstone.  When Carr asked Turnage if she would be paid, Turnage responded that prior to Gemstone's payment to Carr/AAA for the poultry products, Gemstone would require documentation so that Gemstone could properly account for Gemstone's purchases from Carr/AAA.    Documents to perform an appropriate accounting were requested, but the request was ignored.

4.68   Approximately one month later, Turnage received a letter from the law firm Balch & Bingham representing the interests of Carr and AAA.  The letter alleged that Turnage and Gemstone owed Carr/AAA an amount of money.  Turnage responded with a letter through counsel acknowledging that a debt may be owed but informing that an accounting must be performed so that an accurate figure could be obtained.   Turnage asked Carr/AAA to preserve all their records including all communications and correspondences.

## Creation of Farm Fresh Foods, LLC

4.69   While employed as President of RCF and Gemstone, Ensley communicated with upper level management employees—including Pass, Welborne, Wester, Gary Hill, Campos, and other executives and employees of RCF and/or Gemstone—about going to work for a new poultry operation in Guntersville, Alabama. Each of these individuals agreed to abandon their employment with RCF and/or Gemstone without notice and go to work for Ensley and Eddie Hill at a new business named Farm Fresh Foods, LLC.

4.70   Eddie Hill, former interim CFO for RCF and Gemstone, formed Farm Fresh Foods. Upon information and belief, Farm Fresh Foods began its operations in or about January, 2015, with Eddie Hill as its majority owner. In order to start operations in January of 2015, it would take months of planning as well as facility acquisition and construction prior to opening.

4.71   In addition, Plaintiffs have become aware that Carr formed Defendant Portioning Partners. Upon information and belief, Carr utilized all or part of the wrongfully acquired proceeds from the fraudulent invoicing scheme carried out by Carr/AAA to support this new business, as well as Farm Fresh Foods.

4.72   Defendants Pass, Welborne, Wester, Gary Hill, and Campos left RCF and/or Gemstone and became employed as members of Farm Fresh Foods' upper level management team. Each of the non-entity Defendants deleted and/or directed

the deletion of vital information owned by RCF and Gemstone from the employees' respective email accounts upon their separation from RCF and Gemstone. Each of the non-entity Defendants also destroyed and/or directed the destruction of other vital company property in the form of electronic data by wiping and erasing all electronic data kept on their computers. Upon information and belief, each of the non-entity Defendants also downloaded electronic data and/or directed that electronic data be downloaded and provided to Farm Fresh Foods, which constitutes conversion and theft of RCF and Gemstone's property.

4.73   In addition, Pass converted and/or stole the HACCP Plan, required by the U.S.D.A., which was devised, written and owned by RCF and Gemstone at significant cost to Gemstone. Pass provided this information to Farm Fresh Foods to aid in its direct competition with RCF and Gemstone. Farm Fresh Foods has utilized and continues at present to utilize this property of RCF and Gemstone to which Farm Fresh Foods possesses no legal right. Pass and/or Hill created business forms, schedules and other business documents for Farm Fresh Foods using Gemstone's computer systems while employed by RCF and Gemstone.

## Expansion of Farm Fresh Foods

4.74   Recently, Turnage and Plaintiffs RCF and Gemstone have discovered that Defendants are expanding the operations of Farm Fresh Foods to start a new plant even closer to Gemstone's current operation in Decatur, Alabama, to further

entice and poach the RCF employees. It is with the resources attained by Defendants from Plaintiffs, as discussed above, that their business and well-being has prospered. Defendants now continue to solicit employees from Plaintiffs and continue to damage Plaintiffs' business through their unlawful acts. These acts, if allowed to continue, will cause irreparable damage to Plaintiffs in their business.

## V.

## CAUSES OF ACTION

### COUNT I – RICO VIOLATION UNDER 18 U.S.C. § 1964(c)

5.1    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1.1 through 4.74 as if fully set forth herein.

5.2.    The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("Civil RICO") provides a private civil action to recover treble damages for "any person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c).

5.3    Under 18 U.S.C. § 1962(c), it is unlawful "for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."

5.4    At all relevant times, Ensley, Carr, Pass, Welborne, Wester, Eddie Hill, Gary Hill, and Campos were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

5.5    At all relevant times, Ensley and Carr, formed an association-in-fact enterprise recognized by 18 USC § 1961(4) that was, and remains, engaged in, and its activities affect, interstate and foreign commerce, within the meaning of Civil RICO.

5.6    At some point during the relevant time period as described herein, Pass, Welborne, Wester, Eddie Hill, Gary Hill, and Campos joined the association-in-fact enterprise recognized by 18 USC § 1961(4) that was, and remains, engaged in, and its activities affect, interstate and foreign commerce, within the meaning of Civil RICO.

5.7    The structure and purpose of the enterprise involves the supply of poultry products at fraudulently inflated prices through the submission of fraudulently inflated invoices as well as the false and fraudulent acquisition and transportation of poultry products.

5.8    While the enterprise as described herein may have some legal and legitimate activities, the enterprise, through the acts of those constituting the enterprise, has engaged in racketeering activity through a pattern of submitting

fraudulent invoicing via electronic mail, as well as fraudulent communications made by telephone, to Turnage and/or Plaintiffs RCF and/or Gemstone.

5.9    Ensley's conduct in directing that Gemstone pay the fraudulent invoices immediately and automatically by bank wire transfer without review, analysis, or accurate supporting documentation has caused injury and damage to Plaintiffs' property and business.  As a result of the fraudulently inflated invoices that were paid by Gemstone at the direction of the enterprise, the enterprise profited from these activities.

5.10   Each member of the association-in-fact enterprise had the common goal and purpose of generating illicit money through racketeering conduct within the poultry product industry.

5.11   At all relevant times, as a result of their position and control, Defendants Ensley, Carr, Pass, Welborne, Wester, Eddie Hill, Gary Hill, and Campos were able to participate in the operation and management of the enterprise through their own conduct described herein.

5.12   Defendants Ensley, Carr, Pass, Welborne, Wester, Eddie Hill, Gary Hill, and Campos worked together through the enterprise in different aspects of Plaintiffs' business.  Those directing payment of inflated salaries of employees as well as those employees who received inflated salaries possessed knowledge of the fraudulent invoicing scheme being perpetrated by and at the direction of the

enterprise to Plaintiffs' detriment. At all pertinent times, Defendants knowingly and willfully associated with the association-in-fact enterprise and participated and conducted the affairs of the enterprise, directly and indirectly, through a pattern of racketeering activity within the purposes of 18 USC § 1962(c).

5.13 In particular, Ensley, A&M, Carr, AAA, and Eddie Hill, CPA, engaged in "racketeering activity within the meaning of 18 USC § 1961(1)(B)" by engaging in the acts described herein. These acts constitute violation of one or both of the following statutes: 18 USC § 1341 (mail fraud) and 18 USC § 1943 (wire fraud). Each of these Defendants was involved either directing or approving the commission of two or more of these acts of racketeering activity. Each act of mail and/or wire fraud set forth in the facts described herein was directed, sent by, or approved by one or more of these Defendants through the submission of fraudulently inflated invoices and fraudulent use of Gemstone property which crossed state lines and entered the state of Alabama.

5.14 Defendants Ensley, Carr, Pass, Welborne, Wester, Eddie Hill, Gary Hill, and Campos were involved in a pattern of racketeering activity, as they aided and abetted, and were co-conspirators in the promotion of new and competing poultry business(es) which were created through unfair and unlawful competition in violation of the Alabama Trade Secrets Act through the racketeering acts as described herein, including but not limited to the fraudulent invoicing scheme,

willful destruction of Plaintiffs' property, deletion of electronic mail, destruction of Plaintiffs' electronic data, theft of Plaintiffs' property, and cooperation with the other Defendants in accomplishing the purposes of the enterprise, all of which affected interstate commerce.

5.15 All of the facts described herein demonstrate Defendants' knowing creation and participation in a scheme intended to defraud and damage Plaintiffs. Defendants used the United States mail and/or interstate wire transfers in executing said scheme.

5.16 The acts described herein constitute a "pattern of racketeering activity within the meaning 18 USC § 1961(15)." These acts were related to one another by virtue of the commonality of the acts, participants, one or more common victims, a common method of commission (including but not limited to the use of telephone and email to defraud Plaintiffs by misrepresenting the cost of poultry products, the submission of fraudulently inflated invoices, and fraudulent and unauthorized use of Plaintiffs' property), and the common purpose and results of the racketeering activities which are interrelated by their distinguishing characteristics. The predicate acts committed by the Defendants were performed with the specific purpose of inducing Plaintiffs to pay fraudulently inflated prices for the supply of poultry products through utilization of bank wire transfers and/or destruction and/or theft of evidence demonstrating same, as described herein.

5.17 Defendants Ensley and Carr furthered the enterprise's fraudulent racketeering scheme after inquiry by Plaintiffs through telephone conversations and electronic mail by which they presented fraudulent explanations as well as fraudulently omitting material facts, causing Plaintiffs further damages by delaying Plaintiffs' discovery of their fraudulent racketeering acts.

5.18 Ultimately, at or about the time of Ensley's separation from RCF and Gemstone, the enterprise caused submission of an additional fraudulent statement including fraudulently inflated invoices in the amount of $1,131,874, which was paid at the direction of the enterprise as created and established by Ensley and Carr/AAA. If not for Turnage's awareness and diligence in uncovering the pattern of racketeering activity, Defendants' actions would have continued. Defendants had no intentions of ceasing their pattern of racketeering activity until their deceptive and fraudulent actions were exposed.

5.19 Turnage and Plaintiffs RCF and Gemstone relied to their detriment on the misrepresentations and omissions by Defendants that were directed at Turnage and Plaintiffs as part of Defendants' pattern of racketeering activity and which resulted in damage and harm to Plaintiffs' business and property.

5.20 Defendants Ensley, Carr, Pass, Welborne, Wester, Eddie Hill, Gary Hill, and Campos presently continue their pattern of racketeering activity described herein in ongoing businesses aimed at destruction of Plaintiffs' business. Their

pattern of fraudulent conduct is well-established and continues at present. Plaintiffs have incurred damages through the loss of millions of dollars of lost sales and business due to the operations of Farm Fresh Foods, Ensley, Carr/AAA and Portioning Partners, which is a component of the enterprise. Defendants have taken, improperly and illegally, Plaintiffs' money and property and begun new businesses in direct competition with Plaintiffs, causing Plaintiffs further damage in lost sales and business.

5.21 Defendants' pattern of racketeering activity proximately caused the damage to Plaintiffs' business and property as described herein. Each act of mail and/or wire fraud caused further injury to Plaintiffs' business and property. Further, Defendants' have intentionally attempted to conceal the fraudulent and racketeering acts of the enterprise by destroying and/or directing the destruction of electronic mail and other electronic data owned by Plaintiffs, which has further damaged Plaintiffs' business and property.

5.22 As discovered only after the fact by Turnage and Plaintiffs RCF and Gemstone, the relationship between Ensley and Carr was much more than simply a business relationship. From the outset of the discussions between Ensley and Turnage concerning the potential and planning of the new start-up poultry processing business in Alabama that ultimately became RCF and Gemstone, Ensley developed, cultivated, and built a special relationship of trust with Turnage. Ensley

also introduced Turnage to Carr, his business acquaintance and friend (and, as Turnage and Plaintiffs later learned, co-conspirator). Ensley and Carr also deceived Turnage by concealing the true nature of their romantic relationship.

5.23    Ensley and Carr conspired to have Ensley become President of RCF and Gemstone and to continue in this role while Carr/AAA, through fraud, secured an agreement to provide the entirety of Gemstone's poultry product supply. Ensley and Carr represented, and Carr/AAA contractually agreed in writing, that Carr/AAA were to be paid $0.01 per pound above actual costs paid for large volume sales and $0.02 per pound above actual costs paid for one-off, small volume loads.

5.24    In reality, however, Ensley and Carr/AAA intentionally made use of telephone and internet purchases and sales by which Carr/AAA submitted fraudulently inflated invoicing to Gemstone for payment.

5.25    Further, Ensley ensured immediate payment of Carr/AAA's fraudulent invoices through utilization of bank wire transfers of funds paid by Gemstone to satisfy the fraudulent invoices.

5.26    While serving as CPA and interim CFO for RCF and Gemstone, Eddie Hill permitted—either intentionally or through his willful blindness—the unlawful activity as described herein, including but not limited to the fraudulent invoicing scheme, which Eddie Hill realized or should have realized and prevented.

5.27   The improper and unlawful acts as described herein were known, in part, by former members of senior management of RCF and Gemstone—including Defendants Pass, Welborne, Wester, Eddie Hill, Gary Hill, and Campos—who left RCF and Gemstone without notice and went to work for Farm Fresh Foods.   These former employees intentionally aided and abetted the enterprise's conspiracy and misconduct by deleting electronic data on computers owned by RCF and Gemstone and otherwise wiping and deleting electronic data and information belonging to RCF and Gemstone in order to conceal the enterprise's conspiracy and unlawful acts. These acts hindered and damaged the business of RCF and Gemstone and were improper and unlawful acts of theft and destruction of Plaintiffs' property, as well as wire fraud, all of which proximately caused substantial damage to Plaintiffs.

5.28   The acts of wire fraud and unlawful conduct as described herein occurred through a multitude of separate transactions involved in the purchase of approximately 40 loads of poultry products on a weekly basis during 2013 and 2014. Through their respective unlawful acts as described herein, Defendants Ensley, Carr, Pass, Welborne, Wester, Eddie Hill, Gary Hill, and Campos caused, or failed to disclose, the misappropriation and concealment of misappropriation, along with proximately resulting damages arising therefrom, of, upon information and belief, approximately $5,000,000 or more to RCF and Gemstone.

5.29 Farm Fresh Foods is an operation created by and controlled through the enterprise's pattern of racketeering through the acts of Defendants as described herein. Farm Fresh Foods is a business that is conducted without legal right or justification and in contravention of the legal rights and privileges of Turnage and Plaintiffs RCF and Gemstone.

5.30 Although Ensley informed Turnage of his intent to retire in August, 2014, Ensley intentionally delayed his purported plan to retire while he deceptively and fraudulently readied his next poultry business for operation in direct competition with RCF and Gemstone, all while still acting as President of RCF and Gemstone.

5.31 Ensley secured the continued participation of Eddie Hill, CPA, in the set-up of Farm Fresh Foods, and Ensley also secured the commitment of RCF and Gemstone executives and employees, including but not limited to Defendants Pass, Welborne, Wester, Gary Hill, and Campos, with whom he had secured significant advantages in regard to loyalty and trust by using RCF and Gemstone resources to overly compensate these executives while they were employed by RCF and Gemstone.

5.32 Ensley and Carr/AAA persisted in the fraudulent acts of racketeering on a regular basis to the benefit of the enterprise through the fraudulent invoicing scheme whereby they fraudulently extracted money from Gemstone, and by usurping corporate opportunities, until the point in time when Ensley and Eddie Hill,

CPA, began operations with their new start-up, Farm Fresh Foods in Guntersville, Alabama.

5.33   In addition, Defendants Ensley and Carr used the resources of Gemstone and RCF to facilitate outside business operations in Dallas, Texas, and misappropriated the business opportunities of RCF and Gemstone by redirecting the opportunities to these unrelated operations.  Further, upon information and belief, Ensley directed provision of RCF and/or Gemstone resources to support these operations in Dallas, Texas, which are in direct competition with Plaintiffs.   In addition, upon information and belief, Ensley secured and provided poultry products owned by Plaintiffs to these operations in Dallas, Texas, and intentionally provided same without payment and/or for discounted payments to Plaintiffs' detriment. These unlawful, fraudulent acts resulted in significant damages to RCF and Gemstone.

5.34   As a direct and proximate result of Defendants' actions in violation of 18 USC § 1962(c), Plaintiffs have experienced injury and continue to be injured in their business within the meaning of 18 USC § 1964(c) in an amount to be determined upon trial of this action which is due to be trebled in accordance with 18 USC § 1964.  Plaintiffs are therefore entitled to recover all damages resulting from the wrongful actions as set forth herein, together with punitive damages, attorneys' fees, prejudgment interest, post-judgment interest, and costs/expenses.

## COUNT II – RICO CONSPIRACY UNDER 18 U.S.C. § 1964(c)

5.35 Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1.1 through 5.34 as if fully set forth herein.

5.36 Plaintiffs are informed and believe, and on that basis allege, that Defendants' actions and conduct, and their agents' actions and conduct, as alleged herein, were at all times known to the officers, directors, executives, supervisors, managers and/or authorized agents of the each of the entity Defendants, and were known to Defendants Ensley, Carr, Pass, Welborne, Wester, Eddie Hill, Gary Hill, and Campos.

5.37 Despite this knowledge, Defendants nevertheless engaged in such conduct. Further, each Defendant knowingly and intentionally permitted and acquiesced in such conduct on the part of each other Defendant and through the conduct of the employees, servants, and agents of each other Defendant.

5.38 Plaintiffs are informed and believe, and on that basis allege, that some or all Defendants had advance knowledge of the scheme to submit fraudulently inflated invoices to Gemstone, as well as knowledge of the transmission of some or all of the fraudulently inflated invoices submitted to Gemstone to induce payment by bank wire transfer of funds.

5.39 18 U.S.C. § 1962(c) prohibits conducting the affairs of an enterprise through a pattern of racketeering activity. 18 U.S.C. § 1962(d) makes it "unlawful

44

to conspire to violate [18 U.S.C. § 1962(c)]." Hence, 18 U.S.C. § 1962(d) makes it unlawful to conspire to conduct the affairs of an enterprise through a pattern of racketeering activity.

5.40    Defendants conspired and agreed with each other to engage in the conduct, or attempted conduct, stated above, and also conspired and agreed to aid each other in the commission and subsequent concealment through the destruction of evidence of the acts of mail and wire fraud as described herein.

5.41    Defendants conspired, planned, and schemed to conduct the affairs of the association-in-fact enterprise through a pattern of racketeering activity by committing multiple acts of mail and wire fraud in violation of 18 U.S.C. § 1962(c), as described herein.

5.42    Each Defendant combined, conspired and confederated with each other to commit a pattern of racketeering activity, and thereby violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

5.43    Defendants' actions in violation of Civil RICO as referenced and described herein were intentional and part of a conspiracy among each of the other Defendants. Defendants' conspired with regard to each of the predicate acts of improper and unlawful conduct in violation of Civil RICO, including submission of fraudulently inflated invoices, destruction and conversion of Plaintiffs' property (including but not limited to deletion of electronic mail and other electronic data) in

an effort to conceal the fraudulent invoicing conspiracy, and/or directing the destruction and conversion of Plaintiffs' property (including but not limited to deletion of electronic mail and other electronic data in an effort to conceal the fraudulent invoicing conspiracy), all of which occurred through unlawful business activities which included and affected interstate commerce.

5.44  In particular, Defendants Pass, Welborne, Wester, Gary Hill,  and Campos conspired with the other Defendants to delete electronic mail from accounts owned by Plaintiffs, along other electronic data stored on computers owned by Plaintiffs, thereby destroying the data and information in order to hide the unlawful conduct of the enterprise and also to aid the establishment of the operations of Farm Fresh Foods, which was and is operated using some or all of the illicit resources, including but not limited to money, gained unlawfully as a result of the predicate acts of Ensley, Carr and Eddie Hill, CPA. The enterprise has been able to continue to conduct its affairs, at least in part, as a result of the predicate acts of the co-conspirators.

5.45  18 USC § 1962(c) prohibits conducting the affairs of an enterprise through a pattern of racketeering activity.  18 USC § 1962(d) makes it "unlawful to conspire to violate [18 USC § 1962(c)]." Accordingly, it is unlawful to conspire to conduct the affairs of an enterprise through a pattern of racketeering activity. Defendants each conspired and agreed with each other to engage in the conduct of

the enterprise through the predicate acts described herein. Defendants conspired, planned, and schemed to conduct the affairs of the enterprise through multiple acts of mail and wire fraud, along with other unlawful activity as described herein, that affect interstate commerce. As a direct and proximate result of Defendants' conspiracy, within the meaning of Civil RICO, Plaintiffs have been injured and continue to experience injury with regard to their business and property in an amount to be determined at trial of this action, which sum is due to be trebled in accordance with Civil RICO.

5.46    As a direct and proximate cause of Defendants' actions in violation of 18 U.S.C. § 1962(d), Plaintiffs have been and continue to be injured in their business and property within the meaning of 18 U.S.C. § 1964(c) in an amount to be determined upon trial of this action, which sum is to be duly trebled in accordance with 18 U.S.C. § 1964.

5.47    Plaintiffs are therefore entitled to recover all damages resulting from the wrongful actions as set forth herein, together with punitive damages, attorneys' fees, prejudgment interest, post-judgment interest, and costs/expenses pursuant to 18 U.S.C. § 1964(c).

## COUNT III – FRAUDULENT MISREPRESENTATION/ FRAUDULENT INDUCEMENT

5.48    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1.1 through 5.47 as if fully set forth herein.

5.49 Defendants Ensley/A&M and Carr/AAA fraudulently represented to Turnage and Plaintiffs RCF and Gemstone the nature of their intentions concerning conduct of the business and affairs of Plaintiffs. As President of RCF and Gemstone, Ensley owed certain fiduciary duties to RCF and Gemstone, but he instead defrauded Plaintiffs by making numerous material misrepresentations intended to cause, and which did in fact cause, Turnage and Plaintiffs RCF and Gemstone to rely, trust, and have confidence in Ensley as President of RCF and Gemstone. Ensley and Carr/AAA engaged in a scheme to defraud Plaintiffs by which they submitted fraudulently inflated invoices for the supply of poultry products to Gemstone in order to cause Gemstone to pay the fraudulent invoices by bank wire. Plaintiffs were justified in and had the right to rely on the material fraudulent misrepresentations of Defendants Ensley/A&M and Carr/AAA, as set forth herein, and did in fact rely on material fraudulent misrepresentations made by Defendants Ensley and Carr/AAA to their detriment.

5.50 Pursuant to the cost plus agreement under which Carr/AAA supplied poultry products to Gemstone, Carr/AAA were to be paid $0.01 per pound above actual cost paid for large volume sales and $0.02 per pound above actual cost paid for one-off, small volume loads. While Ensley, Carr, and AAA represented, and Carr/AAA contractually agreed, that the fee as set forth above would be charged to Gemstone, these Defendants conspired to defraud Gemstone of millions of dollars

by misrepresenting the price at which they acquired the poultry that Carr/AAA supplied to Gemstone, which significantly and improperly inflated the price invoiced to Gemstone. Moreover, when requested on several occasions in 2015 to provide cost information to support AAA's billings, Carr ignored these requests and refused to supply any responsive information.

5.51 Defendants Ensley and Carr/AAA cultivated a special relationship of trust and confidence with Turnage and Plaintiffs RCF and Gemstone. Turnage and Plaintiffs completely and fully trusted Ensley, Carr, and AAA, and these Defendants knew of the special position of trust they held. Defendants Ensley and Carr/AAA abused this trust to their advantage and to Plaintiffs' detriment. As a result of this special trust and confidence, Defendants knew Plaintiffs would rely on them in their business decision-making.

5.52 Further, Defendant Ensley knew that Turnage trusted him and believed him to be honest and ethical, and therefore Ensley knew that he had unfettered authority to direct Gemstone to make payment via bank wire transfer for the fraudulently submitted invoices submitted by Carr/AAA upon receipt and without any oversight or review.

5.53 In addition to the fraudulent misrepresentations of Defendants Ensley and Carr/AAA, as described herein, Defendant Eddie Hill, CPA, was engaged by

RCF and Gemstone as a CPA and interim CFO during part of the relevant time period.

5.54   Due to his position with RCF and Gemstone, Eddie Hill, CPA, knew that Plaintiffs would rely on and trust him to provide his services in a competent and ethical manner and that Plaintiffs relied on him to act in their best interests. Eddie Hill, CPA, failed to diligently discharge his duties to RCF and Gemstone. Accordingly, the acts of Eddie Hill, CPA, were undertaken with the intent that Plaintiffs rely on them to Plaintiffs' detriment. Plaintiffs justifiably relied and had the right to rely on the misrepresentations and nondisclosures, described herein, and did in fact rely on them. Plaintiffs would not have chosen to conduct business with Ensley, Carr, AAA, or Eddie Hill, CPA, had they known of Defendants' fraudulent conduct and misrepresentations and nondisclosures.

5.55   Plaintiffs were damaged as a direct proximate result of their reliance on Defendants' fraudulent conduct as set forth herein. Plaintiffs are therefore entitled to recover all damages resulting from the wrongful conduct as set forth herein, together with punitive damages, attorneys' fees, prejudgment interest, post-judgment interest, and costs/expenses.

## COUNT IV—BREACH OF THE DUTY OF LOYALTY; BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING; BREACH OF FIDUCIARY DUTY; AND MISAPPROPRIATION OF CORPORATE OPPORTUNITIES BY ENSLEY

5.56   Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1.1 through 5.55 as if fully set forth herein.

5.57   As described herein, Defendant Ensley developed a relationship with Turnage and Plaintiffs in which Ensley convinced them that he was a person in whom Plaintiffs and Turnage should place special confidence, trust and reliance both as an individual with knowledge of the poultry processing business, and an individual with high ethical standards and integrity. Ensley instilled trust in Turnage and Plaintiffs that Ensley could be relied upon to run the day-to-day operations of a new company in the poultry processing business.

5.58   Defendant Ensley was a trusted business confidant, employee, and President of RCF and Gemstone. As President of RCF and Gemstone, Ensley had the authority to direct and oversee the affairs and business of RCF and Gemstone. As such he owed to RCF and Gemstone, as well as their members, the duty of loyalty and the duty of care in conducting the affairs and business of RCF and Gemstone. He also had a fiduciary duty to RCF and Gemstone. It was further his obligation to perform these duties in good faith, with fair dealing and in the best interest of the Plaintiffs. Plaintiffs justifiably relied on Ensley to manage the daily affairs and business of RCF and Gemstone with their best interests in mind, including

51

developing good relationships with employees, vendors, customers, suppliers and the public. Based on such reliance, Plaintiffs invested significant capital and resources in Ensley and the development and growth of the business.

5.59   RCF and Gemstone relied on Ensley to procure every sale possible for the benefit of Plaintiffs, and to secure the lowest cost and highest sales price available. Plaintiffs were justified in believing that as President, Ensley would perform his duties in an ethical, honest and forthright manner.

5.60   In his position as President of RCF and Gemstone, Ensley was aware that Gemstone's business was to acquire, process and sell poultry products for the purpose of generating profits. Instead of promoting the growth of Gemstone's business, however, Ensley promoted the fraudulent relationship between Carr/AAA and Gemstone. While Gemstone could have acquired poultry products without utilization of an outside entity to locate poultry products for Gemstone's purchase, Ensley encouraged and promoted the fraudulent invoice scheme whereby Gemstone was deceived about its cost for acquisition of poultry products, as described herein.

5.61   Business opportunities were presented to Plaintiffs through Ensley wherein Gemstone had the opportunity to acquire and sell, or acquire, process and sell poultry products at a profit that would have enured to the benefit of Gemstone, but those opportunities did not always enure to the benefit of Gemstone. When questioned about these opportunities, Ensley misrepresented the nature, parties and

his own intentions concerning the opportunities. Upon review of information, books, and records, Plaintiffs have become aware that Ensley breached his duties and obligations to Plaintiffs by knowingly failing to attain business opportunities for Gemstone, but instead, Ensley acted in concert with Carr/AAA and/or others to Plaintiffs' detriment and usurped those opportunities to the benefit of Carr/AAA, Farm Fresh Foods and/or others.

5.62  Further, Ensley continually assured Turnage and Plaintiffs RCF and Gemstone that Carr intended to sell her business, AAA, to Plaintiffs. Yet Ensley always was aware that Carr possessed no such intention. Through these false assurances and misrepresentations, Ensley, trusted as he was, intended to string Turnage and the Plaintiffs along to assure Ensley's and Carr/AAA's scheme would continue as long as possible and ensure that Ensley would continue to have access to business opportunities not otherwise available to him until he ultimately left Gemstone and RCF. All of this was done for the benefit of Ensley and to the detriment of Plaintiffs.

5.63  Ensley promoted his enterprise and the business of Carr/AAA to the detriment of RCF and Gemstone through utilization of transportation resources and acquisition capital from RCF and Gemstone, allowing diversion of corporate opportunities that resulted in sales of poultry products by Carr/AAA, Portioning Partners and others to operations located in Dallas, Texas, as well as other locations.

Ensley misappropriated these transactions to the benefit of Carr/AAA as well as others.

5.64    While employed as the President of RCF and Gemstone, Ensley secured commitments from upper level executives and managers of RCF and Gemstone—whom Ensley had hired at extremely favorable salaries and perks (all of which were paid by Plaintiffs) in order to gain these individuals' loyalty—to leave RCF and/or Gemstone and join Farm Fresh Foods, which is a business formed to engage in direct competition against RCF and Gemstone.  Ensley, along with others, solicited the departure of employees from RCF and Gemstone with malicious disregard for his duty of loyalty to the Plaintiffs, his obligation to discharge his duties in good faith and with fair dealing, and in breach of his fiduciary duty.

5.65    In further breach of his duties, Ensley deceived RCF and Gemstone regarding his relationship with Carr.  Ensley and Carr had both a business and romantic relationship for an extensive period of time, and Ensley used Plaintiffs' funds to rent a company apartment in Decatur, Alabama, in which Ensley and Carr, unbeknownst to Turnage and Plaintiffs, cohabited for a period of time.  Ensley further utilized RCF and Gemstone resources to move Carr's belongings from Arkansas to Plaintiffs' apartment in Decatur.

5.66    Ensley maintained a relationship with Carr/AAA whereby Ensley, Carr and AAA schemed to provide fraudulently inflated invoices for Gemstone's

acquisition of poultry products that damaged Gemstone and RCF. Ensley knew that most of the poultry products sold by Carr/AAA to Gemstone were purchased by Carr/AAA at a substantially lower price than the pricing invoiced to Gemstone.

5.67   In addition, Ensley directed that Gemstone pay the fraudulently inflated invoices described herein by bank wire transfers immediately upon receipt, without any review, analysis, or supporting documentation. Moreover, Ensley misappropriated business opportunities of Gemstone to his own advantage and interests, which included the interests of Carr, with whom he maintained a romantic relationship.

5.68   Ensley further promoted and/or directed the deletion or destruction of electronic mail and computer data belonging to Plaintiffs through the efforts of Pass, Welborne, Wester, Gary Hill, and Campos upon their departure from RCF and Gemstone to go to work with Farm Fresh Foods. These former employees of RCF and Gemstone deleted electronic data from computers as well as electronic mail from accounts owned by RCF and Gemstone, as described herein, thereby destroying Plaintiffs' property and leaving little or no trace of Defendants' fraudulent scheme.

5.69   As the President of RCF and Gemstone, Ensley devised a plan to gain the loyalty and trust of Pass, Welborne, Wester, Gary Hill, and Campos by using Plaintiffs' resources in order to populate RCF and Gemstone with management personnel whom he knew would follow his directives, and who did in fact follow his

directives, over the best interests of Plaintiffs RCF and Gemstone. Ensley solicited and secured the departure of these and other high-level executives, managers, and other employees of RCF and Gemstone. He put in place and acted upon a plan to secure the departure of these individuals prior to his departure from RCF and Gemstone. Ensley knew that when Farm Fresh Foods began operating, "his" group of employees would maintain, and ultimately did maintain, an unlawful competitive advantage against RCF and Gemstone.

5.70 Further, as members of senior management of Plaintiffs RCF and Gemstone, Ensley, Pass, Welborne, Wester, Eddie Hill, Gary Hill, and Campos had access to and possession of confidential and proprietary information concerning the business and affairs of RCF and Gemstone. Ensley was aware of the identity of all the customers of Gemstone and their purchasing habits. Utilizing this knowledge, as well as his relationships with the poached departing employees and executives of RCF and Gemstone which Ensley had carefully cultivated with Gemstone and RCF resources, Ensley aided the creation and set up of Farm Fresh Foods. In this way, Ensley maintained a civil conspiracy to commit unlawful acts with Eddie Hill, CPA, as well as with each and every other Defendant to this action. Ensley orchestrated the fraud executed against RCF and Gemstone which unfairly and unlawfully hindered their ability to compete in the marketplace. As a result of this conduct, the sales personnel solicited by Ensley to join Farm Fresh Foods from Gemstone had

direct contact with customers of Gemstone and, together with Ensley, could immediately quote better pricing models to Gemstone's competitive disadvantage.

5.71   Ensley planned for the competitive damage and destruction of RCF and Gemstone through the fraudulent conspiracy that he, Carr, and AAA concocted, thereby converting millions of dollars belonging to RCF and Gemstone through their fraudulent invoicing scheme and other acts.   Ensley's ultimate plan and intent, despite his duties to RCF and Gemstone, was to put RCF and Gemstone out of business.

5.72   In addition, through Ensley's purchase of one or more vehicles in contravention of company protocol, as well as unilateral enactment of new policies such as "Saturday pay" and "bonus pay" for employees, including executives with six-figure salaries, as well as enactment of new pay scales, all of which were in contravention of company protocol, Ensley violated his duties to RCF and Gemstone as well as his obligation to discharge his duties in good faith and with fair dealing.

5.73   Ultimately, after Turnage and Plaintiffs invested in and built the business known as Gemstone and RCF, with Ensley as President, Ensley, while President, became involved in the creation and business of Farm Fresh Foods, a company in direct competition with Plaintiffs.   He did this before leaving Plaintiffs' employ, and he continues in that business today. Farm Fresh Foods is an entity intentionally located in the same geographic area as Plaintiffs.   It capitalizes on

business opportunities which belong to Plaintiffs that were misappropriated by Ensley, and employs multiple management and hourly employees from the shared geographic area who were lured from Plaintiffs' employ by Ensley, Welborne, Pass, Campos, Eddie Hill and Gary Hill.  Farm Fresh Foods is operated, in whole or in part, by Ensley, and is funded through money taken by Ensley and Carr/AAA from Plaintiffs through the fraudulent invoice scheme.

5.74    Through these wrongful acts as described herein, Ensley breached his duty of loyalty, and fiduciary duty, to the Plaintiffs, as well as his obligation to discharge his duties in good faith and with fair dealing, causing them substantial business damage, much of which is irreparable.  In addition, Ensley misappropriated many business opportunities of Plaintiffs, causing irreparable damage to their business and property.  By these breaches, as well as by misusing the proprietary and confidential business information of RCF and Gemstone, Ensley secured for the benefit of Farm Fresh Foods an unlawful competitive advantage over RCF and Gemstone.  Plaintiffs were damaged as the direct and proximate result of Ensley's breach of his duty of loyalty, misappropriation of business opportunities, breach of his fiduciary duty and disclosure of confidential and proprietary information.  Each of the acts described herein was undertaken with willful, wanton, intentional, and reckless disregard for the rights and property of the Plaintiffs.

5.75   Plaintiffs are therefore entitled to recover all damages resulting from the wrongful conduct as described herein, together with punitive damages, attorneys' fees, prejudgment interest, post-judgment interest, and costs/expenses.

**COUNT V—BREACH OF THE DUTY OF LOYALTY; BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING; BREACH OF FIDUCIARY DUTY, AND MISAPPROPRIATION OF CORPORATE OPPORTUNITIES BY PASS, WELBORNE, WESTER, EDDIE HILL, GARY HILL, AND CAMPOS**

5.76   Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1.1 through 5.75 as if fully set forth herein.

5.77   Defendants Pass, Welborne, Wester, Eddie Hill, Gary Hill, and Campos, due to their executive and upper-level management positions, which were comparable to a position of an officer, likewise owed RCF and Gemstone the same duties as described in part above.   As described herein, these Defendants likewise breached their duties of loyalty, breach of fiduciary duty, and duties not to misappropriate corporate opportunities.

5.78   Defendants Pass, Welborne, Wester, Eddie Hill, Gary Hill and Campos were involved in discussions with Ensley concerning Farm Fresh Foods while employed by RCF and Gemstone.   Each was involved in the conspiracy to set up the business and operations of Farm Fresh Foods, or another competitive business, and actively solicited the departure of other employees of RCF and Gemstone to go to work for these other business entities.   These Defendants further encouraged and

promoted the activities of Ensley and the other Defendants as described herein and aided, abetted, and conspired with them in the establishment of one or more competing business entities. All actions undertaken by these Defendants were taken with reckless, willful, and intentional disregard for the rights and property of the Plaintiffs.

5.79   Further, these Defendants breached their duties to Plaintiffs by deleting and/or destroying important electronic data and/or electronic mail from the computers and computers systems owned by RCF and Gemstone, as described herein.

5.80   Plaintiffs were damaged as the direct and proximate result of these Defendants' breaches of the duty of loyalty, misappropriation of business opportunities, and disclosure of confidential and proprietary information. Each of these acts was undertaken with willful, wanton, intentional, and reckless disregard for the rights and property of the Plaintiffs.

5.81   Plaintiffs are therefore entitled to recover all damages resulting from the wrongful conduct as set forth above, together with punitive damages, attorneys' fees, prejudgment interest, post-judgment interest, and costs/expenses.

## COUNT VI—VIOLATION OF THE ALABAMA TRADE SECRETS ACT

5.82   Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1.1 through 5.81 as if fully set forth herein.

5.83   Defendants Ensley, Pass, Welborne, Wester, Eddie Hill, Gary Hill, and Campos were aware of and possessed the confidential, proprietary, and trade secret information belonging to RCF and Gemstone. In particular, Ensley, Pass, Welborne, and Gary Hill were aware of all of Plaintiffs' processes and business practices, the identity, needs, and business habits of Plaintiffs' customers, and Plaintiffs' future business plans.

5.84   Ensley and these individually named Defendants gained a significant and unlawful competitive advantage because of their knowledge of the pricing for poultry products charged by Gemstone to its specific customers. Further, Ensley was aware that the poultry products acquired by Gemstone actually were purchased by Carr/AAA at prices significantly lower than that known to Gemstone. Ensley personally perpetuated Gemstone's deception through his own misrepresentations to Turnage, as described herein.

5.85   Accordingly, Ensley and these individually named Defendants secured an unlawful competitive advantage for Farm Fresh Foods. Farm Fresh Foods utilized the proprietary and confidential information known by Ensley, Pass, Welborne, Wester, Eddie Hill, Gary Hill, and Campos, along with use of former Gemstone sales representatives, to sell to Gemstone's specific customers at lower prices, thus assuring the success of Farm Fresh Foods.

5.86   Plaintiffs have been substantially damaged by Defendants conduct as described herein.   This is especially so given the significant amount of money and time spent by Plaintiffs training Pass, Welborne, Wester, Gary Hill, Campos, and other employees.   Further, based on the conduct described herein, Plaintiffs investment in acquiring and fostering relationships with their customers also has been significantly damaged as a direct proximate result of Defendants' conduct as described herein.

5.87   It is unlawful under the Alabama Trade Secrets Act to improperly disclose or make use of trade secrets of an employer.   Defendants' violations of the Alabama Trade Secrets Act, as described herein, give rise to Plaintiffs' right to recover all damages suffered as a result of their breach, including injunctive relief, attorneys' fees, and costs.

## COUNT VII – BREACH OF CONTRACT—ENSLEY

5.88   Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1.1 through 5.87 as if fully set forth herein.

5.89   The actions of Ensley/A&M as described herein are in violation of his duties as an officer and employee of RCF and Gemstone and constitute a direct breach of his employment contract.

5.90   As a result of the breaches of contract by Ensley, Plaintiffs are entitled to recover all foreseeable damages suffered.

## COUNT VIII – BREACH OF CONTRACT/TORTIOUS
## BREACH OF CONTRACT—CARR AND AAA

5.91   Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1.1 through 5.90 as if fully set forth herein.

5.92   The actions of Carr and AAA as described herein are in violation of their written and oral contractual agreement with Gemstone and constitute a direct breach of contract.

5.93   Plaintiffs are therefore entitled to recover all damages resulting from the breaches as set forth above, together with punitive damages, attorneys' fees, prejudgment interest, post-judgment interest, and costs/expenses.

## COUNT IX – CONSTRUCTIVE TRUST

5.94   Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1.1 through 5.93 as if fully set forth herein.

5.95   Defendants Ensley, A&M, Carr, AAA, and Eddie Hill, CPA, engaged in, conspired, and associated in the submission of fraudulently inflated invoices resulting in millions of dollars in damages to Plaintiffs. This money was taken from Plaintiffs by these Defendants in violation of their fiduciary duties, in violation of their duties of loyalty as described herein, and as a result of Defendants' breach of contract and otherwise fraudulent, unlawful conduct. Defendant Ensley further violated his duties of loyalty and fiduciary duty when he misappropriated corporate opportunities of Plaintiffs as described above. As a result of Defendants' acts,

Plaintiffs are entitled to a constructive trust holding as its corpus the proceeds of all money and business misappropriated by Defendants' breaches as described herein. This constructive trust extends to and includes all of the business known as Farm Fresh Foods, AAA, A&M, Portioning Partners, Ensley, Carr, Eddie Hill, CPA and LeCroix, and any other business, property, partnerships, trusts, retirement accounts, or investments or gifts of the money or opportunities taken from Plaintiffs by these Defendants together with all gains thereon.

## COUNT X—BREACH OF FIDUCIARY DUTY BY EDDIE HILL, CPA AND LeCROIX

5.96 Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1.1 through 5.95 as if fully set forth herein.

5.97 Defendant Eddie Hill, CPA, was engaged by RCF and Gemstone as a CPA and interim CFO from June, 2013, through April, 2014. Eddie Hill provided CPA services to RCF and Gemstone through his firm, Defendant LeCroix, in which he was a named partner. Because of Eddie Hill's positions, Plaintiffs placed a special confidence in him. He and LeCroix were entrusted with proprietary and confidential business information concerning the business of RCF and Gemstone, and Plaintiffs were justified in believing that Eddie Hill and LeCroix would act in their best interests. A fiduciary relationship existed between Plaintiffs and Eddie Hill. Eddie Hill therefore was bound to act in good faith and with utmost regard for Plaintiffs' interests. Moreover, Eddie Hill, CPA, owed to RCF and Gemstone a

number of fiduciary duties, including the duty of undivided loyalty, (meaning Eddie Hill owed Plaintiffs a duty to treat Plaintiffs' affairs as if they were his own), the duty to disclose all relevant facts, and the duty to maintain client confidences.

5.98   During the time in which Eddie Hill, CPA, was engaged by RCF and Gemstone as a CPA and interim CFO, he did not require any review, analysis, or supporting documentation with respect to the fraudulent invoices submitted by Carr/AAA, which would have detected the fraudulent invoicing scheme concocted by Ensley, Carr, and AAA.

5.99   Eddie Hill, CPA, was responsible for the preparation of weekly and monthly financial statements, interim compilation reports, the general ledger, payroll, accounts receivable, tax compliance, accounting system controls, computer support, and other related services for which Eddie Hill and LeCroix were paid thousands of dollars.   Contrary to generally accepted accounting practices and procedures regarding accounts payable, Eddie Hill did not require any review, analysis, or supporting documentation with respect to the fraudulent invoices submitted by Carr/AAA, which he knew or should have known of but failed to prevent.   Eddie Hill's breach of his duties and obligations resulted in Gemstone's failure to detect the fraudulent invoicing scheme concocted by Ensley, Carr, and AAA.   The misconduct and failures on the part of Eddie Hill, CPA, were undertaken

with willful, reckless, and intentional disregard for the rights and property of the Plaintiffs.

5.100 Subsequent to his departure as interim CFO, Eddie Hill, CPA, conspired and aided and abetted the set-up and operation of Farm Fresh Foods in direct competition with his clients, RCF and Gemstone. Each of these acts was in violation of Eddie Hill's duty of loyalty, duty to disclose all relevant facts, and duty to maintain client confidences, and also constituted a breach of contract and breach of the covenant of good faith and fair dealing.

5.101 Further, Eddie Hill, CPA, disclosed and otherwise made use of confidential and proprietary business information belonging to RCF and Gemstone, including trade secret information in violation of the Alabama Trade Secrets Law and Alabama Law of Unfair Competition. Eddie Hill, CPA, competed directly with his client (Gemstone), hired its employees, and took its customers using and with full benefit of all financial, personnel and other confidential and priority information he gained while working for and providing services for Gemstone and RCF as a fiduciary.

5.102 Plaintiffs are therefore entitled to recover all damages resulting from the breaches of Eddie Hill, as set forth above, together with punitive damages, attorneys' fees, prejudgment interest, post-judgment interest, and costs/expenses. Furthermore, Defendant LeCroix is vicariously and/or derivatively and/or jointly

and severally liable for any liability assessed by the jury against Defendant Eddie Hill, CPA.

## COUNT XI—CONVERSION

5.103 Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1.1 through 5.102 as if fully set forth herein.

5.104 Pass, Welborne, Wester, Gary Hill, and Campos are former employees of RCF and/or Gemstone who left the employment of Plaintiffs at various times beginning in January, 2015. Upon their departure from their employment, each of these Defendants wiped and deleted valuable electronic mail from accounts owned by Plaintiffs and/or along with Ensley, directed others to wipe and delete valuable electronic mail from accounts owned by Plaintiffs.

5.105 These Defendants also destroyed valuable electronic data from computers owned by RCF and Gemstone. These actions were destructive to the property of RCF and Gemstone and resulted in damaged to them.

5.106 These Defendants also downloaded and/or otherwise took copies of valuable electronic data from computers owned by RCF and Gemstone. The information taken includes but is not limited to Plaintiffs' HACCP plan (taken by Pass), as well as valuable customer information. These Defendants further used the equipment and resources of RCF and Gemstone, while employed by RCF and

Gemstone, to prepare documents and make other preparations for the business of Farm Fresh Foods.

5.107 These Defendants also converted RCF and Gemstone's transportation resources for their own personal use, as set forth herein.

5.108 As a result of the wrongful conduct described herein, Plaintiffs are entitled to recover all damages against these Defendants for conversion of Plaintiffs' property. Plaintiffs are therefore entitled to recover punitive damages, attorneys' fees, prejudgment interest, post-judgment interest, and costs/expenses.

## COUNT XII—INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS BY ENSLEY, WELBORNE, AND EDDIE HILL, CPA

5.109 Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1.1 through 5.108 as if fully set forth herein.

5.110 Defendants Ensley, Welborne, and Eddie Hill, CPA were aware of the employment relationships between RCF/Gemstone and Pass, Wester, Gary Hill, and Campos, as well as other former employee who are not named as defendants in this action. Ensley, Welborne, and Eddie Hill, CPA owed a duty of loyalty to RCF and Gemstone to act in their best interests.

5.111 With full knowledge of the employment relationships between these parties, and with Ensley acting in his position as President of RCF and Gemstone, Ensley, Welborne, and Eddie Hill, CPA directly or indirectly solicited these

employees away from the employment with RCF and Gemstone, inducing them to leave their employment with RCF and Gemstone and come to work for Farm Fresh Foods, which was, and is, owned in part by Eddie Hill, CPA and one or more other Defendants.

5.112 These Defendants' actions were undertaken with the willful intention of harming RCF and Gemstone and enriching themselves based on ill-gotten gains from Gemstone. Their actions were undertaken with an improper purpose and proximately caused damages to Plaintiffs. As a result of the actions undertaken by these Defendants, Plaintiffs are therefore entitled to recover all damages resulting from Defendants' conduct as set forth herein, together with punitive damages, attorneys' fees, prejudgment interest, post-judgment interest, and costs/expenses.

## COUNT XIII—CIVIL CONSPIRACY

5.113 Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1.1 through 5.112 as if fully set forth herein.

5.114 All Defendants conspired to overbill Gemstone and/or cover these acts.

5.115 Defendants further conspired to misappropriate business opportunities generated through and with Ensley to Gemstone competitors, including Farm Fresh Foods.

5.116 Defendants Ensley and Carr knowingly installed personnel at RCF and Gemstone with whom Ensley and Carr had a close relationship in order to be able to exert control, manipulate, and garner inside and confidential business information.

5.117 Ensley and Carr are part of a group that has caused the intentional interference with and hiring of RCF and Gemstone management personnel, along with other employees, with the goal of taking Gemstone's business and putting Gemstone out of business.

5.118 Defendants acted in concert with one another in a conspiracy to misappropriate money, business opportunities, employees and capital, and/or cover up the acts against the rights and interests of Plaintiffs. These acts were undertaken in violation of each of the Defendant's respective duties to Plaintiffs. Plaintiffs are therefore entitled to recover all damages resulting from the conduct as set forth herein, together with punitive damages, attorneys' fees, prejudgment interest, post-judgment interest, and costs/expenses.

## COUNT XIV—ACCOUNTING

5.119 Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1.1 through 5.118 as if fully set forth herein.

5.120 Defendants Ensley, A&M, Carr, and AAA conspired and associated in the submission of fraudulently inflated invoices resulting in millions of dollars in

damages to Plaintiffs.  Plaintiff Gemstone paid all such invoices at the direction of Ensley.

5.121 Pursuant to the cost plus agreement under which Carr/AAA supplied poultry products to Gemstone, Carr/AAA were to be paid $0.01 per pound above actual costs paid for large volume sales and $0.02 per pound above actual costs paid for one-off, small volume loads.

5.122 On multiple occasions, Turnage and Gemstone have requested information from Carr/AAA to document the actual costs paid for poultry products supplied by Carr/AAA to Gemstone.  Carr and AAA have continually refused to supply such information to Turnage and Gemstone.

5.123 Over the course of 2014, Gemstone purchased millions of pounds of poultry from Carr/AAA.  Based on the information available to Gemstone, Carr/AAA's fraudulent billing for 2014, alone, approaches $5,000,000. Carr/AAA's fraudulent billing also occurred in 2013, but due to the lack of transparency and proper documentation by Carr/AAA, the exact amount of damages presently is unknown.   Furthermore, Ensley and Carr/AAA, as well as Eddie Hill, misappropriated business from Plaintiffs to others as described above in this Complaint.  These Defendants acted in concert with each other to divert business in the wholesale and/or processing of poultry products from Gemstone to themselves and others.

5.124 Gemstone is entitled to an accounting from Carr/AAA concerning all poultry products supplied by Carr/AAA to Gemstone in 2013 and 2014, including but not limited to all purchases with vendors/supplier of Carr/AAA in 2013 and 2014. Gemstone is further entitled to an accounting of all purchases and sales of poultry products involving Carr/AAA to any other person/business other than Gemstone during this period. Gemstone and RCF are further entitled to an accounting of all profits of Farm Fresh Foods, Portioning Partners, Dallas U.S.A., A&M and other businesses and enterprises owned or operated, in whole or in part, by these Defendants, into which unlawfully diverted business of the Plaintiffs was placed. This accounting is to include all business misappropriated by these Defendants from Plaintiffs to others.

## COUNT XV—UNJUST ENRICHMENT

5.125 Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1.1 through 5.124 as if fully set forth herein.

5.126 Based on the conduct of Ensley, Carr, Eddie Hill, AAA, A&M, Farm Fresh Foods and Portioning Partners, these Defendants have been unjustly enriched. Therefore, Plaintiffs are entitled to disgorgement of all unjust benefits received by these Defendants.

## COUNT XVI—PRELIMINARY AND
## PERMANENT INJUNCTIVE RELIEF

5.127 Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1.1 through 5.126 as if fully set forth herein.

5.128 Based on the conduct described herein, Plaintiffs request a preliminary and permanent injunction prohibiting Defendants from further misconduct to the fullest extent allowable by the federal Civil RICO statute and/or any applicable state law.

## COUNT XVII—MONEY PAID BY MISTAKE

5.129 Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1.1 through 5.128 as if fully set forth herein.

5.130 Defendant Ensley/A&M was paid certain bonuses based on Plaintiffs' profit. One such bonus did not take into account invoices from AAA that were submitted late, authorized by Ensley, and paid by Gemstone.

5.131 The payment of those late invoices caused inflation of the profit used to calculate Ensley/A&M's previous bonus payments. Accordingly, the bonus paid was higher than agreed.

5.132 Based on the foregoing, Ensley/A&M should be divested all or part of its bonus payment, which was paid by mistake and due to the fault of Ensley, Carr, and AAA. Plaintiffs also are entitled to compensatory damages and punitive damages in an amount to be determined by a trier of fact.

73

## COUNT XVIII—NEGLIGENCE, GROSS NEGLIGENCE, WANTONESS

5.133 Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1.1 through 5.132 as if fully set forth herein.

5.134 Based on the facts as set forth and described herein, Defendants owed Plaintiffs a duty or duties, Defendants breached said duties, and Defendants' breaches proximately caused damages to Plaintiffs.

5.135 As described herein, Defendants' conduct was so outrageous, extreme, willful, intentional, and/or without regard to the right of Plaintiffs as to be found wanton and reckless such that Plaintiffs are entitled to recovery of all damages suffered, including punitive damages, attorneys' fees, costs, and any and all other damages allowable by applicable law.

## COUNT XIX—UNLAWFUL SUPPRESSION OF MATERIAL FACTS

5.136 Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1.1 through 5.135 as if fully set forth herein.

5.137 Based on the wrongful conduct as described herein of Ensley, Carr, Pass, Welborne, Wester, Eddie Hill, Gary Hill, and Campos, these Defendants are liable to Plaintiffs for unlawfully suppressing material facts from RCF and/or Gemstone pursuant to Ala. Code. § 6-5-102 and Alabama common law.

5.138 The suppression of material facts which these Defendants were under an obligation to communicate to Plaintiffs by virtue of their management or

executive level employment with Plaintiffs constitutes fraud as a matter of law. These Defendants concealed and or failed to disclose material information to Plaintiffs as set forth herein. Based on the failures of these Defendants, Plaintiffs were induced to refrain from acting to prevent their damages. The concealment and/or failure to disclose by these Defendants proximately caused damages to Plaintiffs.

5.139 Plaintiffs are therefore entitled to recover all damages resulting from these Defendants' conduct as set forth herein, together with punitive damages, attorneys' fees, prejudgment interest, post-judgment interest, and costs/expenses.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs respectfully pray that Defendants be required to answer this Complaint and that upon trial of this matter, Plaintiffs recover judgment against Defendants including the following:

(a)  an award of compensatory damages in an amount in excess of $7,500,000.00 or other amount to be determined upon trial of this action;

(b)  treble damages pursuant to 18 U.S.C. § 1964;

(c)  incidental, consequential, and punitive damages;

(d)  costs, attorneys' fees, and expenses;

(e)  prejudgment interest;

(f)  post-judgment interest;

(g)  an accounting;

(h)    a constructive trust;

(i)    preliminary and permanent injunctive relief; and

(j)    award of such further and different relief as the Court deems just.

**PLAINTIFFS DEMAND A TRIAL BY JURY.**

This 2nd day of December, 2015.

Respectfully submitted,

*GEMSTONE FOODS, LLC and RCF,*
*LLC*

By:_____
Michael A. Akers

OF COUNSEL:
Michael A. Akers (AL Bar No. 4331-R74M)
AKERS LAW GROUP, PLLC
P.O. Box 280
Brandon, Mississippi 39043
mikeakers@akerslawgroup.com